# United States Court of Appeals

### For the Eighth Circuit

_____

No. 22-2960
_____

William Salier; Karla Salier

*Plaintiffs - Appellants*

v.

Walmart, Inc.; Hy-Vee, Inc.

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: June 15, 2023
Filed: August 7, 2023
_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.
_____

LOKEN, Circuit Judge.

As the COVID-19 pandemic swept the nation, those infected with the virus, which in many cases proved fatal, searched for new pharmaceutical treatments. A few physicians began prescribing the "off-label" use of ivermectin, an anti-parasitic agent that is FDA-approved for treating intestinal conditions caused by parasitic worms, and hydroxychloroquine, which is FDA-approved to treat several autoimmune

conditions and to treat or prevent malaria.[1]  In this case, a Missouri physician prescribed ivermectin and hydroxychloroquine to Minnesota residents William and Karla Salier to treat their severe COVID-19 infections.  Pharmacists at Walmart and Hy-Vee stores in Albert Lea, Minnesota, refused to fill the prescriptions.

The Saliers acquired and consumed a more concentrated veterinary formulation of ivermectin, commonly known as "horse paste."  Their COVID-19 symptoms improved, and they resumed normal activities in one week and fully recovered in two weeks.  The Saliers then filed this diversity action against Walmart and Hy-Vee (collectively, Defendants), seeking compensatory and punitive damages for alleged violations of the Saliers' common law right of "self-determination" and for the intentional infliction of severe emotional distress.  After hearing extensive argument, the district court[2] granted Defendants' motions to dismiss all claims with prejudice. Salier v. Walmart, Inc., 622 F. Supp. 3d 772 (D. Minn. 2022).  Applying Minnesota law, the court denied the Saliers' request to certify the self-determination issues to the Supreme Court of Minnesota and dismissed the self-determination claims as not recognized by Minnesota common law, consistent with the rulings of every court to consider similar claims around the country.[3]  Id. at 778-79 & n.2.  It dismissed the intentional infliction of emotional distress claim for failure to plausibly allege the requisite extreme and outrageous conduct by Defendants.  Id. at 780.  The Saliers appeal these rulings.  We affirm.

---

[1]Physicians may prescribe FDA-approved products for an off-label use if they determine it is appropriate to treat their patients.

[2]The Honorable Patrick J. Schiltz, Chief Judge of the United States District Court for the District of Minnesota.

[3]See, e.g., DeMarco v. Christiana Care Health Servs., Inc., 263 A.3d 423, 437 (Del. Ch. 2021); Pisano v. Mayo Clinic Fla., 333 So. 3d 782, 789 (Fla. Dist. Ct. App. 2022); Gahl on behalf of Zingsheim v. Aurora Health Care, Inc., 977 N.W.2d 756, 774-76 (Wis. App. 2022) (collecting cases), aff'd, 989 N.W.2d 561 (Wis. 2023).

## I. The "Self-Determination" Claims

In October 2021, William Salier became seriously ill with COVID-19. An Iowa clinic denied his request for an ivermectin prescription to treat the virus. Ivermectin tablets are approved by the U.S. Food and Drug Administration ("FDA") as safe and effective to treat some human conditions but are *not* approved to treat COVID-19.[4] William obtained a prescription for ivermectin from Dr. Mollie James, a Missouri physician, who sent the prescription to a Walmart pharmacy in Albert Lea. The pharmacist refused to fill the prescription, telling Karla ivermectin is not an appropriate treatment for COVID-19. When Karla protested, the pharmacist "rudely lectured" Karla -- and later Dr. James -- about the dangers of treating COVID-19 with ivermectin. Karla then contracted COVID-19. Dr. James prescribed ivermectin and hydroxychloroquine[5] and sent the prescriptions to the same Walmart pharmacy. The

---

[4]U.S. Nat'l Libr. of Med, Label: Ivermectin tablet, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=847a1dd7-d65b-4a0e-a67d-d90392059dac. We take judicial notice of these authorities, as well as those cited in the district court's opinion. See Bauer v. AGA Serv. Co., 25 F.4th 587, 591 (8th Cir. 2022) ("We may consider items subject to judicial notice in connection with a Rule 12(b)(6) motion to dismiss.").

[5]Hydroxychloroquine is also not FDA-approved to treat COVID-19. It is used for the treatment of rheumatoid arthritis and two types of lupus, as well as for the treatment and prophylaxis of malaria. U.S. Nat'l Libr. of Med., Label: Hydroxychloroquine Sulfate tablet, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=84b00366-96ef-41e1-bac6-5d24acdb9e1d. The FDA revoked emergency-use authorization of hydroxychloroquine for treatment of COVID-19 on June 15, 2020, more than a year before Karla contracted COVID-19. See U.S. Food & Drug Admin., Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and#:~:text=The%20agency%20determined%20that%20the,authorized%20uses%20in%20the%20EUA.

pharmacist again refused to fill the prescriptions.  Dr. James then sent William and Karla's prescriptions to a Hy-Vee pharmacy in Albert Lea.  The Hy-Vee pharmacist refused to fill them, explaining that Hy-Vee's "corporate policy" barred its pharmacists from dispensing ivermectin and hydroxychloroquine to treat COVID-19.

The Saliers then purchased and consumed a veterinary formulation of ivermectin used to treat horses and other large animals.  They quickly recovered from COVID-19 and commenced this diversity action in federal court.  Their primary claim is that Defendants' refusal to fill their prescriptions violated their "common-law right to self-determination."  The operative paragraphs of their self-determination claims against Walmart in Counts One and Two of their Amended Complaint allege:

> Under Minnesota law, every person enjoys a common law right to self-determination.  Cornfeldt v. Tongen, 262 N.W.2d 684 (Minn. 1977).  A corollary of this right is the common law right of "every adult of sound mind to determine what shall be done with his own body."  Id. at 701.

> Defendant Walmart, Inc. had no reasonable medical or scientific basis for declining to fill William Salier's prescription for Ivermectin for the sole reason that his doctor had prescribed it to treat COVID-19.

> Defendant Walmart, Inc.'s refusal to fill William Salier's prescription endangered his life and forced him to improvise with a version intended for horses, not humans, to save his own life.

> Defendant Walmart, Inc. violated William Salier's right to self-determination by declining to provide him the safe and effective treatment -- Ivermectin -- that his doctor prescribed simply because it chose to replace his doctor's reasoned judgment and [William's] own reasoned decisionmaking with baseless political conclusions.

-4-

The operative paragraphs of their self-determination claims against Hy-Vee in Counts Seven and Eight are worded identically except Count Eight includes refusing to fill Karla's hydroxychloroquine prescription, and the allegation in the fourth paragraph that Walmart based its refusal to fill the prescriptions on "baseless political conclusions" is replaced with the allegation that Hy-Vee based its refusal on "a one-size-fits-all corporate policy based on political fearmongering."

Defendants promptly moved to dismiss these claims, alleging that "Minnesota law does not recognize a cause of action based on violation of an asserted 'right to self-determination.'" The right discussed in the Cornfeldt case cited by Plaintiffs, Defendants argued, "is limited to the right to refuse medical treatment, and to be sufficiently informed to give meaningful consent to treatment." Minnesota common law does not recognize a right "to *compel* an unwilling healthcare provider to participate in a plan of care that is contrary to its judgment, policy, and/or public health agency guidance." By statute and by administrative rules, "Minnesota law enables pharmacists to exercise independent judgment" in filling prescriptions.

In opposing Defendants' motions to dismiss, the Saliers conceded that Cornfeldt "specifically" recognized only "a tort of negligent non-disclosure" but noted that "no Minnesota appellate court has dealt with its broader statement that 'every adult of sound mind' has a right 'to determine what shall be done with his own body.' [Cornfeldt, 262 N.W.2d at 701]." Therefore, Plaintiffs asserted, this is an open question of Minnesota common law. The Saliers urged the district court either to rule that "[r]eceiving proper medical treatment belongs in the hands of informed patients and reasonable doctors who have assessed their patients' individual conditions . . . not pharmacists acting based on corporate and political motivations," or to certify this question to the Supreme Court of Minnesota.

The district court dismissed these claims, refusing to recognize "the sweeping new right" of medical self-determination asserted by the Saliers. Salier, 622 F. Supp.

3d at 778.  "[N]othing in Cornfeldt or any other case suggests that, under Minnesota law, a health-care provider has a legal obligation to provide any and all treatments or medications demanded by a patient," especially when -- as here -- the treatment requested is against the provider's professional judgment.  Id. at 777-78.  The court emphasized that no other States have recognized such a right and it would have disastrous policy implications.  Id. at 778.  For the same reasons, the district court denied the Saliers' request to certify the issue to the Supreme Court of Minnesota, "confident[ly]" concluding that "[t]his is not a close question [of Minnesota law]." Id. at 778 & n.2.

On appeal, the Saliers argue the district court erred by refusing to recognize their asserted Minnesota "common-law right to self-determination."  They maintain this right exists and allowed them to compel Walmart and Hy-Vee pharmacists to fill their prescriptions for ivermectin and hydroxychloroquine, which the Saliers allege are "safe and effective treatment[s]" for COVID-19.  Acknowledging this is an issue of first impression under Minnesota law, they rely on a single sentence in Cornfeldt -- "[o]ur society is morally and legally committed to the principle of self-determination, a corollary of which is the right of every adult of sound mind to determine what shall be done with his own body."  262 N.W.2d at 701.  In Cornfeldt, the Supreme Court of Minnesota held that a claim that a physician violated the well-recognized tort of medical malpractice may be based upon the physician's negligent non-disclosure of information the patient needs to exercise his or her well-recognized right to *refuse* treatment.  Id. at 699.  Though no Minnesota appellate court has cited this dicta in the 46 years since Cornfeldt was decided, the Saliers contend this language "cannot be passed off as mere obiter dictum."  It recognizes an established principle, "self-determination," that "easily extends" beyond the negligent nondisclosure of treatment risks and embraces the "medication corollary" the Saliers assert in this case.  We disagree that this is an expansive controlling principle of Minnesota common law.

-6-

First, as the district court recognized, we are a federal court sitting in diversity considering an issue of first impression that the Supreme Court of Minnesota has not addressed. Our task is to predict, to the best of our ability, how that Court would rule. See, e.g., Kingman v. Dillard's Inc., 643 F.3d 607, 615 (8th Cir. 2011). The issue is whether violation of an alleged common law right the Supreme Court of Minnesota has not recognized states a claim in a federal diversity action. Prior recognition is not determinative. The Supreme Court of Minnesota has repeatedly stated that it "has the power to recognize and abolish common law doctrines" because "[t]he common law is not composed of firmly fixed rules." Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233 (Minn. 1998). In Lake, the Court "join[ed] the majority of jurisdictions and recognize[d] the tort of invasion of privacy." Id. at 235. Here, by contrast, not a single State has recognized the asserted right of a patient to force a medical provider to provide treatment against the provider's professional judgment, and several state courts have held there is not a right -- "constitutional, statutory, regulatory, or common-law" -- to compel such treatment. Salier, 622 F. Supp. 3d at 778; see cases cited *supra* note 3.

In predicting how the Supreme Court of Minnesota would rule on this issue, "we look to relevant state precedent, analogous decisions, considered dicta, and any other reliable data to determine how the Supreme Court of [Minnesota] would construe [Minnesota] law." Ashley Cnty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (quotation omitted). As the district court explained, the Saliers are asking a federal court sitting in diversity to recognize a "sweeping new right" based "on a fragment of sloppy dicta in an opinion that analyzed a different issue" -- dicta that has not been cited a single time by a Minnesota appellate court. Salier, 622 F. Supp. 3d at 778. The Saliers provide no other support for the asserted common law self-determination right under Minnesota law. Indeed, in Madsen v. Park Nicollet Medical Center, the Supreme Court of Minnesota cautioned that the "informed consent/nondisclosure doctrine" at issue in Cornfeldt "does not involve negligence . . . in failure to treat." 431 N.W.2d 855, 861 (Minn. 1988). "It is not the role of a

-7-

federal court to expand state law in ways not foreshadowed by state precedent." Ashley Cnty., 552 F.3d at 673 (cleaned up). We share the district court's confidence that the Supreme Court of Minnesota would not recognize the "right to self-determination" asserted by the Saliers. That is the end of our inquiry as a federal court sitting in diversity.

Second, the Saliers make no attempt to define the elements of the common law action for breach of a patient's self-determination right to compel medical treatment, here, by filling a prescription. The above-quoted paragraphs of their Amended Complaint make clear the asserted right is not absolute. But what are its elements? Is it a negligence tort or an intentional tort? Is it always violated by a pharmacist if the patient has a physician's prescription? If not, when? If a plaintiff has not defined the elements of a claim in tort *that has not been recognized anywhere*, there is no way to determine whether a *cognizable* claim has been plausibly pleaded.

Third, the allegations in the Amended Complaint that Walmart and Hy-Vee "had no reasonable medical or scientific basis for declining to fill" the Saliers' ivermectin and hydroxychloroquine prescriptions are frivolous on their face. As counsel for the Saliers well knew, the FDA and every government agency and major medical authority addressing the issue had denounced and recommended against using ivermectin to treat COVID-19, and the FDA had revoked its initial emergency-use authorization to use hydroxychloroquine to treat patients hospitalized with COVID-19 in June 2020. See Salier, 662 F. Supp. 3d at 779 n.4. In September 2021, the American Medical Association, American Pharmacists Association, and the American Society of Health-System Pharmacists issued a joint press release strongly opposing ordering, prescribing, or dispensing ivermectin to prevent or treat COVID-19 outside of a clinical trial. See id. A published statement by the Minnesota Board of Pharmacy, which regulates the practice of pharmacy in Minnesota, advised that a pharmacist has a duty to determine the legal validity of a prescription and to ensure it is clinically appropriate, and advised that public health agencies condemned the use

of ivermectin to prevent or treat COVID-19.[6] The allegations that Walmart and Hy-Vee simply chose to replace the judgment of an outlier physician with their "baseless political conclusions" and "a one-size-fits-all corporate policy based on political fearmongering" are absurd hyperbole, if not outright falsehoods.

## II. The Intentional Infliction of Emotional Distress Claims

The Saliers appeal the district court's dismissal of their claims for intentional infliction of emotional distress for failure to plausibly plead that the pharmacists' alleged actions amounted to "extreme and outrageous" conduct. Salier, 622 F. Supp. 3d at 780. Like most jurisdictions, the Supreme Court of Minnesota now recognizes intentional infliction of emotional distress ("IIED") as an independent tort. Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438 (Minn. 1983). The elements of this tort under Minnesota law are: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." Id. at 438-39. The conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Id. at 439 (quotation omitted). "The operation of this tort is sharply limited to cases involving particularly egregious facts" in order "to prevent fictitious and speculative claims." Id.

---

[6]Minn. Bd. of Pharmacy, Frequently Asked Questions: Complaints, https://mn.gov/boards/pharmacy/public/frequentlyaskedquestions.jsp (answer to question "Can a pharmacist refuse to fill a prescription for Ivermectin to treat or prevent COVID-19?" begins: "It is the legal responsibility of the pharmacist to determine the legal validity of a prescription and ensure the prescription is clinically appropriate for the patient. A pharmacist may refuse to fill or refill a prescription if, in the pharmacist's professional judgement, there is a question as to the drug's safety and/or efficacy.").

The Saliers claim they plausibly pleaded IIED claims because refusing to fill the Saliers' prescriptions because of a "corporate policy" that ivermectin and hydroxychloroquine are not appropriate treatments for COVID-19 (Hyvee), and refusing to fill prescriptions based on the pharmacist's "political judgments" despite being told that ivermectin is "safe" and "effective in inhibiting . . . COVID-19" (Walmart), were extreme and outrageous conduct. The district court acknowledged that refusing to dispense life-saving medicine for these reasons *could be* extreme and outrageous, but this case:

> does not remotely approach those circumstances. At the time that Walmart and Hy-Vee refused to provide ivermectin and hydroxychloroquine to the Saliers, every major medical authority and government agency that had addressed the issue had said that ivermectin and hydroxychloroquine should not be used to treat COVID-19. Obviously, there is nothing extreme or outrageous about a pharmacist's following the advice of these authorities.

Salier, 662 F. Supp. 3d at 779-80. We agree.

The Saliers argue that the refusal of Walmart and Hy-Vee pharmacists to fill their prescriptions constitutes extreme and outrageous conduct because it substituted their "political" professional opinions for "Dr. James' reasoned and qualified judgment." The Amended Complaint provides no support for the Saliers' conclusory, facially-implausible assertion that the Walmart pharmacist's refusal was "politically-motivated." The Amended Complaint alleges the Walmart pharmacist was "paternalist[ic] and rude" in lecturing Karla that she was endangering William's health by seeking to treat him with ivermectin. But "[l]iability for intentional infliction of emotional distress does not extend to insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Langeslag v. KYMN Inc., 664 N.W.2d 860, 865 (Minn. 2003) (quotation omitted). The allegation that the Hy-Vee

-10-

pharmacist said he was following "corporate policy" is neither extreme nor outrageous in these stressful circumstances.

Moreover, the Saliers do not allege experiencing physical or specific psychological consequences after the pharmacists refused to fill their prescriptions, nor that they sought medical or mental health treatment for their distress. To the contrary, they allege both fully recovered from COVID-19 two weeks after self-treating with horse paste. The Saliers allege Defendants' refusals caused them to suffer severe emotional distress -- fear for each other's lives. Unquestionably, the unknown and potentially severe consequences of contracting COVID-19, and the uncertainty of how to treat it, caused countless Americans great emotional distress. But this is not enough to plead a plausible claim of IIED. See Edison v. Nat'l R.R. Passenger Corp., No. 20-CV-0614, 2021 WL 2515516, at *11 (D. Minn. June 18, 2021), and cases cited. We affirm the dismissal of the Saliers' IIED claims.

## III. Procedural Issues

A. The Certification Issue. On appeal, the Saliers place great emphasis on their claim that the district court abused its discretion in declining to certify the self-determination issue to the Supreme Court of Minnesota. A Minnesota statute provides that the "Supreme Court . . . may answer a question of law certified to it by [*inter alia*] a court of the United States or by an appellate court of another state . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, subdiv. 3. Certification can be useful, but it results in expense and delay and requires careful formulation of a certified question that will be determinative of a federal diversity lawsuit. Accordingly, "absent a close question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it." Perkins v.

Clark Equip. Co., Melrose Div., 823 F.2d 207, 209 (8th Cir. 1987) (cleaned up); see Saunders v. Thies, 38 F.4th 701, 717-18 (8th Cir. 2022).

Here, after a thorough survey of prior relevant state court decisions, the district court declined to certify because "[t]his is not a close question" of Minnesota law. Salier, 622 F. Supp. 3d at 778 n.2. For reasons previously explained, we agree. Further cutting against certification is the fact that the Saliers *chose* to file this action in federal court, intentionally forgoing a state court action where an adverse decision may be appealed ultimately to the Supreme Court of Minnesota. Federal courts "should be slow to honor a request for certification from a party who chose to invoke federal jurisdiction." Smith v. SEECO, Inc., 922 F.3d 406, 412 (8th Cir. 2019), quoting 17A Charles A. Wright et al., Federal Practice & Procedure § 4248 (3d ed. 2017 update). The district court did not abuse its discretion in refusing to certify this issue to the Supreme Court of Minnesota.

B. An Expert Review Affidavit Issue. The district court alternatively dismissed the self-determination and IIED claims because the Saliers failed to show excusable neglect for their failure to comply with the Minnesota statute requiring an attorney pursuing claims sounding in medical malpractice to submit an affidavit averring that an expert witness has examined the facts of the case and determined that "one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subdivs. 2-3; see Salier, 662 F. Supp. 3d at 781-83. Defendants urge us to affirm on this ground as well. Plaintiffs argue a notice was not required and they should have been given an extension of time if it was. As we have affirmed dismissal of these claims on the merits, we need not address these issues.

For the foregoing reasons, the judgment of the district court is affirmed.

_____